**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>FOR PUBLICATION</u>

-----------------------------------------------------------------x

In re:                                                          Chapter 11

ADELPHIA COMMUNICATIONS CORP., *et al.*      Case No. 02-41729 (SHL)

                                    Debtors.       (Jointly Administered)

-----------------------------------------------------------------x

ADELPHIA COMMUNICATIONS CORP. and
QUEST TURNAROUND ADVISORS, LLC,

                                    Plaintiffs,

                    vs.                                            Adv. Pro. No. 19-01027 (SHL)

U.S. SPECIALTY INSURANCE COMPANY,

                                    Defendant.

-----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**MASINI, VICKERS, RUKSAKIATI & HADSELL, P.C.**
*Counsel for Adelphia Communications Corp. and Quest Turnaround Advisors, LLC*
  By:   Thomas A. Vickers, Esq.
150 S. Wacker Drive, 24th Floor
Chicago, Illinois 60606

**WOLLMUTH MAHER & DEUTSCH LLP**
*Counsel for Adelphia Communications Corp. and Quest Turnaround Advisors, LLC*
  By:   Paul R. DeFilippo, Esq.
        Lyndon M. Tretter, Esq.
500 Fifth Avenue
New York, New York 10010

**CLYDE & CO US LLP**
*Counsel for U.S. Specialty Insurance Company*
  By:   Scott Schwartz, Esq.
405 Lexington Avenue, 16th Floor
New York, New York 10174

        -and-

By:   Douglas M. Mangel, Esq.
1775 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20006

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for summary judgment filed in the above-captioned

adversary proceeding by Adelphia Communications Corp. ("Adelphia") and Quest Turnaround

Advisors, LLC ("Quest," and together with Adelphia, the "Plaintiffs") on the one hand, and by

U.S. Specialty Insurance Company ("U.S. Specialty" or the "Defendant") on the other.  *See*

*Plaintiffs' Combined Mot. and Supp. Mem. Pursuant to Local Bankruptcy Rule 7056-1, for Entry*

*of an Order (A) Granting Plaintiffs Summ. J. on Count I of their Compl. (Declaratory J.) (Adv.*

*Proc. No. 19-01027, Doc. 1, Filed 02/20/19); and (B) Granting Plaintiffs Summ. J. as to Liability*

*on Count II of their Compl. (Breach of Contract) (Adv. Proc. No. 19-01027, Doc. 1, Filed*

*02/20/19)* [ECF No. 25][1] (the "Plaintiffs' SJM"); *Mem. Of Law in Supp. of Defendant U.S.*

*Specialty Insurance Company's Cross Mot. for Summ. J.* [ECF No. 26] ("U.S. Specialty SJM").

Adelphia and Quest seek coverage under an insurance policy issued by U.S. Specialty for certain

defense fees, costs and expenses incurred in Adelphia's bankruptcy proceeding.  U.S. Specialty

argues that coverage is precluded by a fee exclusion contained in that policy.[2]  For the reasons

set forth below, the Court grants the Plaintiffs' SJM and denies the U.S. Specialty SJM.

---

[1]      Unless otherwise indicated, references in this Decision to docket entries on the Case
Management/Electronic Case Files ("CM/ECF") system are to Adversary Proceeding No. 19-01027.

[2]      Per this Court's *Amended Scheduling and Pre-Trial Order*, dated August 22, 2019 [ECF No. 20], the issues
have been bifurcated between coverage and damages.  The Plaintiffs therefore seek summary judgment on Count 1
of their Complaint and partial summary judgment as to liability only on Court II of their Complaint.  *See* Plaintiffs'
SJM at 1.

## BACKGROUND

The material facts set forth in this Decision are not in dispute. *See generally Joint Statement of Undisputed and Material Facts* [ECF No. 24] (the "SUF"). In June 2002, Adelphia and its affiliated debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. *See* Case No. 02-41729 [ECF No. 1]. Some 15 years ago, the Court confirmed the *Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors* (the "Plan"). *See* SUF ¶ 1. The Plan became effective shortly thereafter. *See* SUF ¶ 2.

The Plan dissolved Adelphia's Board of Directors and vested the rights, powers and executive authority of the Board in a new fiduciary known as the "Plan Administrator." *See* SUF ¶ 2. After confirmation, Quest and Adelphia executed a Plan Administrator Agreement (the "Plan Administrator Agreement") that retained Quest as the Plan Administrator. *See* SUF ¶ 3; *see also* Plan Administrator Agreement, attached as Exhibit A to the SUF.[3] The Plan Administrator Agreement obligates Adelphia to indemnify Quest for any expenses that Quest incurs in a proceeding relating to the Plan Administrator Agreement, including issues dealing with Quest's role as the Plan Administrator. *See* SUF ¶ 6 (citing Plan Administrator Agreement, Section 4.7(b)).[4]

---

[3]     The SUF states that the Plan Administrator Agreement was entered into on February 12, 2017. *See* SUF ¶ 3. But as the Plan Administrator Agreement is dated February 12, 2007, *see* Plan Administrator Agreement at Preamble, the Court assumes the 2017 date is a typographical error.

[4]     That section of the Plan Administrator Agreement provides that:

[a]s a material part of the consideration for the Plan Administrator to furnish its services under this Agreement, in the event that any Quest Person becomes involved in any capacity in any claim, suit, action, proceeding, or investigation (including, without limitation, any shareholder or derivative action or arbitration proceeding) . . . in connection with any matter in any way relating to this Agreement or arising out of the matters contemplated by this Agreement (including, but not limited to, Quest's role as Plan Administrator or the role of any Quest Person as a Governor, officer or director of any Debtor), the Debtors (to the extent services are not services for the Contingent Value Vehicle described in the immediately succeeding parenthetical) and the

In early 2007, U.S. Specialty began insuring Quest in its capacity as Plan Administrator under a series of insurance policies.  *See* SUF ¶¶ 7-8.  The policy currently at issue is the Directors, Officers and Organization Liability Insurance Policy No. 14-MGU-10-A20695 (the "Policy"),[5] which was initially issued for the period from January 5, 2010 to January 5, 2012 and was subsequently extended to "TBD plus 6 (six) years."  SUF ¶¶ 7-9 (citing Policy at Declarations and quoting Policy at Endorsement No. 42).[6]  Under the Policy, Quest qualifies as an **Original Insured Organization**[7] and Adelphia is listed as an **Additional Insured Organization**.  *See* SUF ¶¶ 13-14; Policy, Endorsement No. 15, Section 1.  The Policy defines an **Insured Organization** as "the **Original Insured Organizations**, but solely in their capacity as **Plan Administrator** for [Adelphia].  **Insured Organization** will also include the **Additional Insured Organizations** . . . ."  Policy at Endorsement No. 15, Section 2.  The Policy also provides for coverage if Adelphia is obliged to indemnify Quest under the Plan Administrator Agreement.  *See* Policy at Endorsement No. 15, Section (4); *see also* SUF ¶ 11.[8]

---

Contingent Value Vehicle (to the extent services are Administrative Services or other services being performed for the Contingent Value Vehicle pursuant to a written request therefor by the CVV Trustees) agree to indemnify, defend and hold each such Quest Person harmless to the fullest extent permitted by law, from and against any losses, claims, damages, liabilities and expenses in connection with any matter in any way relating to this Agreement or arising out of the matters contemplated by this Agreement (including, but not limited to, Quest's role as Plan Administrator or the role of any Quest Person as a Governor, officer or director of any Debtor), except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that such losses, claims, damages, liabilities and/or expenses resulted primarily from the willful misconduct, gross negligence, bad faith, or fraud of that Quest Person.

Plan Administrator Agreement, Section 4.7(b).

[5]   A copy of the Policy is attached as Exhibit B to the SUF.

[6]   The Policy is the second renewal of the policy first issued on January 5, 2007.  *See* SUF ¶ 8.

[7]   Terms defined in the Policy are in boldface type in this Decision.

[8]   Endorsement No. 15 of the Policy states that "if [Adelphia] is required to pay **Loss** to satisfy its indemnity obligations to an **Insured Organization** . . . pursuant to Section 4.7 . . . of the [Plan Administrator Agreement], this Policy will afford coverage for such **Loss**, subject always to this Policy's terms and conditions (including those set forth in this endorsement)."  Policy at Endorsement No. 15, Section (4).

The basic coverage grant of the Policy provides that U.S. Specialty "will pay to or on behalf of the **Insured Organization** [any] **Loss** arising from **Claims** first made against it during the **Policy Period** . . . for **Wrongful Acts**." Policy at Insuring Agreement (B); *see also* SUF ¶ 10. Under the Policy, a **Loss** includes **Defense Costs**, which are the "reasonable legal fees, costs and expenses, consented to by the Insurer . . . resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured**." Policy at Definitions (C) and (J). A **Wrongful Act** includes a **Professional Services Wrongful Act**, which means "any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty committed or allegedly committed in rendering or failing to render **Professional Services**." Policy at Endorsement No. 15; *see also* SUF ¶ 18. **Professional Services** are, in turn, defined as "those services that the **Plan Administrator** is obligated to perform pursuant to the [Plan Administrator Agreement]." Policy at Endorsement No. 15, Section 1; *see also* SUF ¶ 19. A **Claim** includes, among other things, "(1) any oral or written demand, including any demand for non-monetary relief, [and] (2) any civil proceeding commenced by service of a complaint or similar pleading." Policy at Definition (B); *see also* SUF ¶ 16. As applied to the current dispute then, the Policy provides coverage to Quest for legal fees and costs for a claim made against it for an alleged breach of duty in its providing of services as Plan Administrator.

Endorsement No. 15 excludes from coverage "any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any fee or other compensation due or allegedly due in return for any service provided pursuant to the [Plan Administrator Agreement]."[9] Policy at Endorsement No. 15, Section 5 (the "Fee Exclusion"); *see also* SUF ¶ 12.

---

[9]    The base form of the Policy excludes coverage for any "**Loss** in connection with a **Claim** . . . for any actual or alleged breach of contract or agreement. . . .", thereby eliminating coverage for breach of contract claims. Policy at Exclusion (P). But Endorsement No. 15 amends this breach of contract exclusion so that it "will not apply to **Claims** for **Professional Services Wrongful Acts**." Policy at Endorsement No. 15, Section (7).

In February 2018, creditor Solus Alternative Asset Management, L.P. ("Solus") filed a motion in Adelphia's bankruptcy proceeding seeking, among other things, removal of Quest as Plan Administrator for cause (the "Original Motion"). *See* SUF ¶ 22. The Original Motion was subsequently amended in June 2018 (the "Amended Motion" and together with the Original Motion, the "Solus Motions")[10] by Solus and ACC Claims Holdings, LLC (together, the "Movants"). *See* SUF ¶ 26. Adelphia and Quest opposed the relief requested by the Movants and the Court held an evidentiary hearing on the Amended Motion in October 2018. *See* SUF ¶¶ 23, 27, 30-31. Adelphia, Quest and the Movants ultimately settled the disputes raised in the Solus Motions and in June 2019, the Court entered the *Order Approving and "So-Ordering" Stipulation and Overruling Objection*. *See* SUF ¶ 32. Pursuant to this settlement, the Solus Motions were resolved, the Plan Administration Agreement was terminated and a new party was appointed as Plan Administrator. *See Stipulation and Consent Order With Respect to (A) Motion of Solus Alternative Asset Management LP and ACC Claims Holdings LLC, (B) Second Amendment to Plan Administrator Agreement, and (C) Appointment of Successor Administrator*, attached as Exhibit P to the SUF [ECF No. 24-16].

Plaintiffs Adelphia and Quest now seek coverage under the Policy for the fees, costs and expenses they incurred in defending the Solus Motions. Defendant U.S. Specialty acknowledges that fees incurred in defense of the Solus Motions meet the coverage grant under the Policy,[11] but

---

[10]    Copies of the Original Motion and the Amended Motion are attached as Exhibits F and J, respectively, to the SUF.

[11]    The parties agree that the Original Motion and the Amended Motion constitute a single **Claim** for **Wrongful Acts** against Quest under the terms of the Policy. *See* SUF ¶ 33 (citing Policy at Definitions (B) and (U) and Condition (C)). They also agree that the Original Motion and Amended Motion constitute a single **Claim** for **Professional Services Wrongful Acts** against Quest. *See* SUF ¶ 33 (citing Policy at Definitions (B) and (U), as amended by Endorsement No. 15, and Condition (C)). Similarly, the parties agree that as a result of the **Claim** asserted against Quest by the Movants, Quest incurred fees, costs, and expenses. *See* SUF ¶ 35. Nor does U.S. Specialty dispute that Adelphia indemnified Quest pursuant to Section 4.7 of the Plan Administrator Agreement for

argues that the Fee Exclusion precludes coverage because—it claims—the Solus Motions related

to the fees owed to Quest.  *See* SUF ¶ 36.  The Plaintiffs counter that the Fee Exclusion is

inapplicable because it applies to a "fee or other compensation *due or allegedly due*," whereas the

Solus Motions sought termination of Quest as Plan Administrator and related to fees that were

already paid to Quest.  Policy at Endorsement No. 15, Section 5 (emphasis added); *see* SUF ¶ 37.

## DISCUSSION

### A. Legal Standards

1. Summary Judgment

Federal Rule of Civil Procedure 56, made applicable by Rule 7056 of the Federal Rules

of Bankruptcy Procedure, governs the granting of summary judgment.  "[S]ummary judgment is

proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

[movant] is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986) (quoting Fed. R. Civ. P. 56).  If the "the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l

Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

"A fact is material when it might affect the outcome of the suit under governing law."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).  But "the mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477

---

some portion of the fees, costs, and expenses that Quest incurred as a result of the **Claim** asserted against it by the
Movants.  *See* SUF ¶ 35.

U.S. 242, 247–48 (1986).  "The Court may also grant some but not all of the relief requested in a summary judgment motion if it finds disputed issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  The showing necessary to satisfy this initial burden depends on which side bears the burden of proof on a particular issue at trial.  *See Read Prop. Grp. LLC v. Hamilton Ins. Co.*, 2018 WL 1582291, at *5 (E.D.N.Y. Mar. 30, 2018).  When the movant has the burden of proof at trial, its own submissions in support of the motion must entitle it to judgment as a matter of law.  *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  When the burden of proof falls on the nonmoving party, it is generally sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim.  *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  To avoid summary judgment, the nonmoving party must then come forward with evidence sufficient to raise a genuine issue of fact for trial.  *See id*.

"In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at 587).  But "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation[,]" *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001), and "only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"When cross motions for summary judgment are made, the standard is the same as that for individual motions." *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* "Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

2. <u>Choice of Law</u>

The Policy does not identify the law that governs its interpretation and, therefore, the Court must determine which state law to apply. Bankruptcy courts generally apply the choice of law principles of the forum state. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); *see also Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 186-87 (2d Cir. 2012). Thus, the Court looks to the choice of law rules of New York, the forum state in this case.

Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Allstate Ins. Co. v. Stolarz*, 81 N.Y.2d 219, 223 (1993)). An actual conflict will be found to exist where "the applicable law from each jurisdiction [that might

apply] provides different substantive rules" that are "relevant to the issue at hand . . . and must

have a significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman*

*Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal citations and quotations

omitted). If no actual conflict exists, then a choice of law analysis is unnecessary. *See IBM v.*

*Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter,

however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the

absence of substantive difference, however, a New York court will dispense with choice of law

analysis; and if New York law is among the relevant choices, New York courts are free to apply

it."); *Curley*, 153 F.3d at 12; *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489

(App. Div., 1st Dep't 2003) ("If no conflict exists, then the court should apply the law of the

forum state in which the action is being heard."). All parties agree that either the law of

Colorado or of New York would apply in these circumstances and that there is no material

conflict between the laws of these states.[12] *See* Plaintiffs' SJM at 5; U.S. Specialty SJM at 11

n.4. As a choice of law analysis is unnecessary, the Court will look primarily to New York law

for this Decision, with references to Colorado law where helpful.

3. Insurance Contract Interpretation

Insurance policies are normally construed using the same principles that apply to general

contract interpretation. *See Castle Oil Corp. v ACE Am. Ins. Co.*, 26 N.Y.S.3d 783, 786 (App.

Div., 2d Dep't 2016) (internal citation omitted); *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d

115, 120 (Colo. 2016) ("An insurance contract is subject to the general rules of contract

interpretation.") (internal citation omitted). When interpreting an insurance policy, therefore,

---

[12]    The Policy, which does not contain a choice of law provision, was issued to Quest c/o Adelphia at
Adelphia's offices in Colorado and Adelphia's bankruptcy case is pending in New York. *See* Plaintiffs' SJM at 5;
U.S. Specialty SJM at 11 n.4.

"[u]nambiguous provisions must be given their plain and ordinary meaning." *Castle Oil*, 26 N.Y.S.3d at 786 (internal citations omitted); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyds, London*, 136 F.3d 82, 86 (2d Cir. 1998); *State Farm Mut. Auto. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo. 1997) ("[I]n the absence of ambiguity, an insurance policy must be given effect according to the plain and ordinary meaning of its terms.") (internal citation omitted).  A policy "should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Ins. Co. of N.Y. v. Cent. Mut. Ins. Co.*, 850 N.Y.S.2d 56, 58 (2008) (internal citation and quotation omitted); *see also Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) ("Courts should read the provisions of the policy as a whole, rather than reading them in isolation."); *Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998) ("We should avoid disrupting the parties' settled expectations and the purposes for coverage as expressed or implied in the insurance policy.").  A "court should not read a contract so as to render any terms, phrase, or provision meaningless or superfluous." *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (App. Div., 2d Dep't 2013) (internal citations omitted); *see also Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010) ("[W]e construe the policy so that all provisions are harmonious and none is rendered meaningless.").

Additionally, "the court 'may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.'" *Georgitsi Realty, LLC v. Penn-Star Ins. Co.*, 702 F.3d 152, 155 (2d Cir. 2012) (quoting *In re Matco-Norca, Inc.*, 802 N.Y.S.2d 707, 709 (App. Div., 2d Dep't 2005)); *see also Cyprus Amax Minerals*, 74 P.3d at 299 ("In undertaking the interpretation of an insurance contract, courts should be wary of rewriting

provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy . . . Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage.") (internal citations and quotations omitted).

The language of the insuring provisions in an insurance policy generally "should be broadly interpreted, with any doubts as to coverage resolved in favor of the insured." *Berman v. Gen. Accident Ins. Co. of Am.*, 671 N.Y.S.2d 619, 623 (Sup. Ct., N.Y. Cty. 1998); *see also Farmers All. Mut. Ins. Co. v. Ho*, 68 P.3d 546, 550 (Colo. App. 2002) ("Coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage. . . . Thus, when an insurer seeks to restrict coverage, the limitation must be clearly expressed. . . . In the absence of such a clear expression of limitation, or if the policy provisions are inconsistent or ambiguous, the insurance contract must be construed in favor of coverage and against limitations.") (internal citations and quotations omitted).

Not surprisingly then, any "[e]xclusions to coverage must be strictly construed and read narrowly, with any ambiguity construed against the insurer." *Lancer Indem. Co. v. JKH Realty Grp.*, LLC, 7 N.Y.S.3d 492, 494 (App. Div., 2d Dep't 2015) (internal citations omitted); *see also Frontier Insulation Contractors v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997) ("To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision."); *O'Connor v. Proprietors Ins. Co.*, 696 P.2d 282, 284 (Colo. 1985) ("[E]xclusions in an insurance policy must be strictly construed against

the insurer, and a forfeiture of coverage based on technical violations is a result not favored in the law.") (internal citations omitted); *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008) ("[T]he insurer bears the burden of proving that a particular loss falls within an exclusion in the contract.").

Thus, "[t]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Lancer Indem.*, 7 N.Y.S.3d at 494 (internal citations and quotations omitted); *see also Nicholls v. Zurich Am. Ins. Group*, 244 F. Supp.2d 1144, 1156 (D. Colo. 2003); *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011); *Renfandt v. N.Y. Life Ins. Co.*, 419 P.3d 576, 580 (Colo. 2018) ("[W]hen seeking to avoid coverage based on a policy exclusion, the insurer must establish that the exclusion applies in the case, and that the exclusion is not subject to any other reasonable interpretation.") (internal citation omitted). Exclusions or exceptions from coverage "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009) (internal citations and quotations omitted); *see also J & S Enters., Inc. v. Cont'l Cas. Co.*, 825 P.2d 1020, 1023 (Colo. App. 1991) ("[I]f exclusions are inserted in order to limit the general liability insurance coverage, such exclusions are to be strictly construed against the insurer . . . . Only if exclusions, when viewed as a whole, unambiguously and unequivocally negate coverage are they interpreted in the insurer's favor.") (internal citations omitted).

## B.  Defendant's Arguments Regarding Interpretation of Insurance Exclusions

As a threshold matter, the Defendant asserts that the normal rules regarding the interpretation of insurance exclusions should be altered.  The Defendant notes that the Fee

Exclusion was added to the Policy under Endorsement No. 15 and contending that it was the result of negotiations between U.S. Specialty and Quest's insurance broker. *See* U.S. Specialty SJM at 12. The Defendant argues that the Fee Exclusion should therefore "be given greater weight than other provisions that appear in the basic policy form." *Id*. But the Court disagrees. There is no evidence in the record that the Fee Exclusion itself was requested or co-drafted by the Plaintiffs' insurance broker. The Defendant cites to three email exchanges between U.S. Specialty and Willis—the Plaintiffs' insurance broker— but none of these emails reference the Fee Exclusion. *See* Exhibits C, D and E to SUF. Rather, they appear to contain initial drafts provided by Nancy Middelear, U.S. Specialty's underwriting attorney, as well as inquiries by Ms. Middelear regarding policy inceptions dates and identities of insured persons and organizations, along with responses to those inquiries by Willis. *Id.* Standing alone, these emails do not provide a basis for upending the normal rules for interpretation of the Fee Exclusion here.

Nor does the legal authority cited by the Defendant support its position on this issue. The Defendant cites to the Restatement of Contracts which states that "[i]n the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable . . . (d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) Contracts § 203(d). The Defendant also cites to *Moshiko, Inc. v. Seiger & Smith, Inc.*, 529 N.Y.S.2d 284, 288-89 (App. Div., 1st Dep't 1988), arguing that the case enforced policy language as written where requested by the broker on the insured's behalf. But once again, the Court lacks evidence of the Fee Exclusion being separately requested or negotiated. Moreover, *Moshiko* did not give "greater weight" to a policy exclusion or set out a new rule of insurance contract interpretation.

Rather, the appellate court in *Moshiko* found that the trial court below had rewritten the terms of the policy; the appellate court instead applied the language of the policy as written, which the court found was "clear on its face." *Id.* at 287. In any event, the Court's job here is to interpret the language of the Fee Exclusion itself given that all parties agree that the Policy otherwise provides coverage. And as explained below, the Court concludes that the plain language of the Fee Exclusion does not apply here, meaning that the result would be the same regardless of whether the Fee Exclusion is given greater weight or regardless of which party has the burden of proof.

The Defendant also seeks to distinguish certain of the cases cited by the Plaintiffs to support the burden being placed on the insurer to establish the applicability of a policy exclusion. *See Def.'s Mem. Of Law in Opp. to Pls.' Mot. for Summ. J.* at 4-5 [ECF No. 28] ("U.S. Specialty Opposition"). Specifically, the Defendant argues that the coverage in the cases cited by the Plaintiffs relate to an insurers duty to defend, whereas the Policy at issue here is different because it does not involve a duty to defend but rather a reimbursement of covered defense costs. *See id.* (citing Policy at Conditions (D)(1), (2); *Apt. Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, 593 F.2d 1188 (10th Cir. 2010); *Frontier Insulation Contrs. v. Merchants Mut. Ins. Co.*, 91, N.Y.2d 169) (1997)). The Defendant argues that coverage obligations under a duty to defend policy are more expansive than under a duty to reimburse under an indemnification clause, and therefore the heightened burden cited by the Plaintiffs is inapplicable here where the only question is whether a claim is actually covered.

But New York case law does not appear to differentiate between duty to defend and duty to reimburse cases when addressing the standard for reviewing policy exclusions. *See, e.g., Millenium Partners*, *L.P. v. Select Ins. Co.,* 882 N.Y.S.2d 849, 853 (Sup. Ct. N.Y. Cty. 2009)

(discussing exclusion standard in case involving reimbursement of defense costs).  The cases

cited by the Defendant in support of its argument do not address where the burden lies when

interpreting an insurance policy exclusion; these cases instead concern the showing necessary to

trigger a duty to reimburse defense costs.  *See Petroterminal de Panama, S.A. v. Houston Cas.

Co.*, 114 F. Supp. 3d 152, 158 (S.D.N.Y. 2015) ("[U]nder policies containing a duty to reimburse

defense costs but not a duty to defend, the Insurers have a duty to reimburse defense costs for

claims that are established to be covered through judgment and settlement, and not for claims

only potentially falling within the policy's coverage.") (internal citations and quotations

omitted); *Farmington Cas. Co. v. United Educators Ins. Risk Retention Grp., Inc.*, 117 F. Supp.

2d 1022, 1027 (D. Colo. 1999).  But the question of whether a duty to reimburse defense costs

has been triggered is not at issue in this case.  The parties do not dispute whether coverage exists

for such defense costs under the insuring clause of the Policy; the Defendant itself acknowledges

that "[t]he sole issue to be decided on these cross motions is whether the Fee Exclusion bars

coverage for [the claim]."  U.S. Specialty SJM at 12; *see supra* note 12.[13]

---

[13]    The Defendant also cites to *Beazley Ins. Co, Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616 (S.D.N.Y. 2016), which states that the burden on the insurer to establish the applicability of a policy exclusion is

> merely a specific, heightened application of *contra proferentem*, the principle by which ambiguities in an insurance contract are construed against the insurer. . . . And *contra proferentem* does not come into play unless this court first determines that the contract is, in fact, ambiguous. . . .

*Id*. at 623 (citing *Sea Ins. Co. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 n.4 (2d Cir. 1995); *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001)).

But there are several problems with the Defendant's reliance on *Beazley*.  First, this quoted language is dicta, as the court's decision in *Beazley* turned on the meaning of the terms "customer" or "client," which the Court determined by reference to federal securities law.

Second, the Defendant neglects language in the same paragraph of *Beazley* that undercuts its argument. That language states, in no uncertain terms, that "[u]nder well-settled New York law, 'whenever an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language.'"  *Id.* (citing *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009)).

## C.  **The Applicability of the Fee Exclusion**

Turning to the meaning of the Fee Exclusion itself, the Plaintiffs assert that the Defendant

has not met its burden to establish that the Fee Exclusion bars coverage of the defense fees, costs

and expenses incurred by the Plaintiffs in defending against the Solus Motions.  The Court

agrees.

The language of the Fee Exclusion provides in relevant part:

> [t]he Insurer will not be liable to make any payment of **Loss** in connection with a
> **Claim** arising out of, based upon or attributable to any fee or other compensation
> *due or allegedly due in return for any service provided* pursuant to the [Plan
> Administrator Agreement].

Policy at Endorsement No. 15, Section 5 (emphasis added).  The Plaintiffs correctly note that the

clause "due or allegedly due for . . . services provided" adds a temporal limitation to the Fee

Exclusion, such that the Fee Exclusion applies only to unpaid claims for fees "due or allegedly

due" to Quest for services "provided" by Quest under the Plan Administrator Agreement.  The

Solus Motions here sought removal of Quest as Plan Administrator for cause and based on

---

Third, *Beazley* cites to *Westchester Fire* and *Hugo Boss*, *see id.,* and neither of these cases stands for the proposition that an insurer does not have the burden of establishing that an exclusion applies.  Quite the opposite. The Second Circuit explicitly stated in *Westchester Fire* that "an *insurer* must establish that [an] exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  *Westchester Fire*, 51 F.3d at 26 (emphasis added) (internal citations and quotations omitted).  It further explained:

> We cannot accept the district court's conclusion that the *contra proferentem* principle, which
> provides that where there is ambiguity as to the existence of coverage, doubt must be resolved in
> favor of the insured and against the insurer, . . . does not apply because this dispute lies between
> two insurers. . . .  The district court's conclusion that *contra proferentem* does not apply is at odds
> with its conclusion (with which we agree) that the *Seaboard Surety* test applies. The *Seaboard
> Surety* rule, construing exclusions against the insurer unless they are stated in 'clear and
> unmistakable' language, is merely a specific, heightened application of *contra proferentem*. . . .
> No authorities cited by the parties convince us that the New York Court of Appeals would find the
> *Seaboard Surety* rule inapplicable to this dispute over construction of a homeowner's policy.

*Westchester Fire*, 51 F.3d at 26 n.4.  *Hugo Boss* simply examines whether a phrase within the language of a policy exclusion is ambiguous and notes that, if it is, *contra proferentem* applies.  *Hugo Boss*, 252 F.3d at 616-17.  In sum, neither *Westchester Fire* nor *Hugo Boss* supports the notion that the burden of establishing the exclusion here should not be on the insurer invoking the exclusion.

compensation *previously* paid to Quest, not compensation "due or allegedly due" for services

provided under the Plan Administrator Agreement.

The Plaintiffs' interpretation is supported by *Chubb Custom Ins. Co. v. Grange Mut. Cas.*

*Co.*, 2011 U.S. Dist. LEXIS 111583 (S.D. Ohio 2011), which also examined a policy exclusion

that contained the same phrase "due or allegedly due." That policy provided for the insurer

Chubb to indemnify Grange for losses that arose from Grange's performance as an insurance

company conducting claims handling and adjusting. *See id.* That policy contained a benefits

due exclusion that excluded coverage

> for any amounts which constitute benefits, coverage or amounts due or allegedly
> due, including any amount which constitutes interest thereon, from the Insureds
> as:
>
> i. an insurer or reinsurer under any policy or contract or treaty of insurance,
> reinsurance, suretyship, annuity or endowment; or
>
> ii. an administrator under any employee welfare benefit plan[.]

*Id.* at *8. Grange sought coverage under the policy for settlement payments, defense fees, and

expenses it incurred in two class action lawsuits where Grange allegedly had paid its insureds

less than they were entitled to recover on their claims. *See id.* at *10-*12. Chubb argued that

coverage for these settlement amounts and defense fees was precluded by the benefits due

exclusion.

The court in *Grange Mutual* held that the exclusion did not preclude coverage. It noted

that under the language of the exclusion, "the amounts sought must be 'due or allegedly due' for

the exclusion to apply." *Id.* at *31. In examining the meaning of the phrase "due or allegedly

due", the court referred to Black's Law Dictionary which defined "due" in part as "owing or

payable; constituting a debt" and provided the following example of the word's usage: "the tax

refund is due from the IRS." *Id.* at *31 (quoting Black's Law Dictionary 9th Ed. 2009)).

Black's Law in turn defined the word "debt" in part as a "[l]iability on a claim; a specific sum of money due by agreement or otherwise[.]" *Id*; *accord Emplrs. Mut. Cas. Co. v. Brant Lake Sanitary Dist.*, 2019 U.S. Dist. LEXIS 22549, at *17 (D. S.D. Feb. 12, 2019) (looking to Black's Law Dictionary for interpretation of the word "due" in policy exclusion, with Black's Law stating that "[t]he word 'due' means '[o]wing or payable,' while the word 'owing' simply means 'yet to be paid.'") (quoting Black's Law Dictionary, 10th ed. 2014).

The court in *Grange Mutual* ultimately held that Chubb had "not demonstrated that the plaintiffs in the [class actions against Grange] were seeking 'any amounts which constitute benefits, coverage or amounts due or allegedly due' from Grange as their insurer." *Id.* at *35.  In reaching this conclusion, the court noted that "the settlement class members had already settled their . . . claims with Grange, and therefore no amounts were 'due' or 'allegedly due.'" *Id.* at *34-*35.

Similar to the circumstances in *Grange Mutual*, the plain language of the Fee Exclusion here applies to fees or other compensation "*due or allegedly due* in return for any service provided."  Policy at Endorsement No. 15, Section 5 (emphasis added).  Reading the language of the Fee Exclusion strictly and narrowly, as required by applicable case law, the Court agrees with the Plaintiffs that the Fee Exclusion imposes a temporal limitation.  Like *Grange Mutual*, the allegations in the Solus Motions did not involve fees or compensation "owing or payable" to Quest.  Indeed, the primary focus of the Solus Motions—and the hearings on those motions— was the request for removal of Quest as Plan Administrator for cause.  Fees or compensation arrangements were addressed by the Solus Motions primarily in connection with the request to remove Quest.  As a secondary matter, the discussion of fees in the Solus Motions did not relate to fees owed but rather to fees that had already been paid to Quest or Quest's request for a

possible future fee arrangement for work not yet performed.  *See, e.g.,* Amended Motion at 1, 3,
11-13 (seeking removal of Quest as Plan Administrator for cause, including Quest having
previously overpaid itself in breach of the Plan Administrator Agreement and Quest having
demanded supplemental compensation in order to monetize estate tax credit); Original Motion at
1-4 (objecting to reasonableness of Plan Administrator's new fee arrangement, specifically to
fees to be earned in the event that Adelphia enters into a transaction for the sale of its net
operating losses and noting that "[t]o the best of Solus' knowledge, no NOL Transaction is even
reasonably in prospect"); Original Motion at 1, 5-6, 15  (requesting accounting of fees paid and
hours expended by Quest to determine whether Quest previously received compensation in
violation of the Plan Administrator Agreement and stating that any excess compensation should
be repaid to the estates); *see also* Amended Motion at 14-15 (seeking appointment of successor
to Quest and that such successor act as a quasi-examiner to examine, among other things,
whether Quest should be required to return prior fee payments to the estate).  None of these fall
within the Fee Exclusion.

The Defendant argues that a present dispute regarding fees existed, specifically whether
Quest was entitled to receive additional fees to monetize estate assets.  *See* U.S. Specialty SJM at
18-19.  But it is clear that the allegations were based on future work that Quest might perform
and were not related to fees "due or allegedly due *in return for any service provided*."  Policy at
Endorsement No. 15, Section 5 (emphasis added); *see* Amended Motion at ¶¶ 4, 32 (noting that
Quest requested additional fees to monetize a tax refund).  No services had been provided with
respect to the monetization of those assets and as a result, no fees could have been due or
allegedly due for those future services.

In its argument, the Defendant focuses on the lead-in phrase "arising out of, based upon or attributable to" that precedes the limiting language of "due or allegedly due" in the Fee Exclusion. Quoted in full, the relevant language provides:

> [t]he Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** *arising out of, based upon or attributable to* any fee or other compensation due or allegedly due in return for any service provided pursuant to the [Plan Administrator Agreement].

Policy at Endorsement No. 15, Section 5 (emphasis added). The Defendant contends that this language requires a broad application of the Fee Exclusion, arguing that that the phrase "arising out of" in the insurance context is "ordinarily understood to mean originating from, incident to, or having connection with." U.S. Specialty SJM at 13 (quoting *Maroney v. New York Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (2005). U.S. Specialty notes that the language "requires only that there be some causal relationship between the injury and the risk for which coverage is provided or excluded." *Id.* (quoting *Nat. Organics, Inc. v. OneBeacon Am. Ins. Co.*, 959 N.Y.S.2d 204, 208 (App. Div., 2d Dep't 2013)). Thus, the Defendant contends that "a broadly framed fee exclusion will bar coverage when the primary harms alleged or relief sought share some causal relationship with a dispute over fees" and argues that the relief requested in the Solus Motions contains the necessary causal relationship to fees such that the "arising out of" language of the Fee Exclusion bars coverage. *Id.* at 15.

But the cases relied on by the Defendant for this result are distinguishable. They deal with much more "broadly framed" exclusions that relate generally to all fees, in contrast to the Fee Exclusion here that is more narrowly tailored only to fees that are "due or allegedly due for services provided. . . ." *See* U.S. Specialty SJM at 13-14 (relying, *inter alia*, on *BancorpSouth, Inc. v. Fed. Ins. Co.*, 873 F.3d 582, 584-85 (7th Cir. 2017) (holding under Mississippi law that insurer had no obligation to defend or indemnify insured in lawsuit asserting claims for overdraft

fees due to policy exclusion for "any [c]laim . . . based upon, arising from, or in consequence of *any fees or charges*.") (emphasis added); *First Community Bancshares v. St. Paul Mercury Ins. Co.*, 593 Fed. App'x 286, 288 (5th Cir. 2014) (holding that fee-dispute exclusion relating to claims "based upon, arising out of or attributable to *any dispute involving fees or charges* for an Insured's services" did not negate insurer's duty to defend class action lawsuits brought against insured because "at least some allegations potentially fall outside of the exclusion and within coverage") (emphasis added); *Continental Casualty Co. v. Ramsey*, 2017 U.S. Dist. LEXIS 29550, at *3-*4, *35 (E.D. Tex. Feb. 11, 2017) (finding fee exclusion relating to claims "based upon, directly or indirectly arising out of, or in any way involving . . . *a dispute over fees, commissions or charges*, including, without limitation the structure of fees or excessive fees . . ." was inapplicable to insurer's duty to defend lawsuit against insured because "at least some of the factual allegations" in the complaint "do not necessarily bear a causal relationship to fees") (emphasis added)).

In contrast to these cases, the Fee Exclusion in this case contains clear language that narrows its applicability only to fees "due or allegedly due" and the Defendant's position impermissibly reads this language out of the Policy. *See Givati*, 960 N.Y.S.2d at 198 (a "court should not read a contract so as to render any terms, phrase, or provision meaningless or superfluous."); *Georgitsi Realty*, 702 F.3d at 155 (a court "may not . . . excis[e] terms [of a contract] under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.'"); *see also Sachs*, 251 P.3d at 546 ("[W]e construe the policy so that all provisions are harmonious and none is rendered meaningless."). If the Defendant wished to exclude a broader range of fees from coverage, it should have drafted a clause that did so. *See, e.g., Taylor v. United States Cas. Co.*, 269 N.Y. 360, 363 (1936) ("If the

22

insurance company desired the exclusion clause to cover not only a case where the driver is

under the age fixed by law but also a case where the terms of the license are violated, it should

have so specified.").

This conclusion is confirmed by the facts underlying the Solus Motions. In short, there is

no causal relationship between the allegations in the Solus Motions and the activities that the Fee

Exclusion seeks to exclude from coverage. The allegations raised in the Solus Motions focus

primarily on the removal of Quest for improper conduct. This contrasts with the *Bancorp* case

relied upon by the Defendant. In *Bancorp*, the insured pointed to several paragraphs in the

complaint that did not mention overdraft fees, but the court noted that other sections tied the

allegations in those paragraphs directly to overdraft fees covered by the exclusion. 873 F.3d at

586-87. The court observed that "individual allegations cannot be read in a vacuum, and instead,

must be read in the context of the entire complaint." *Id*. at 586. The court found that "the

overdraft fees in the [complaint] were not an additional harm among many" but rather "the

central and only harm" and constituted the "essence" of the complaint. *Id*. at 587.[14]

---

[14]    While the Court looks at the pleadings to determine the scope of the issues in the Solus Motions, the result here is borne out by the witness testimony at the hearings on the Solus Motions, which focused on actions taken, or not taken by Quest, and whether these actions conflicted with Quest's fiduciary duty on behalf of all creditors. *See, e.g.,* Hr'g Tr. 24:10-12 (Oct. 15, 2018) [Case No. 02-41729, ECF No. 14738] ("Solus submits that the conduct displayed in connection with the May 15 and May 21 meetings is not consistent with the fiduciary obligations of Quest."); *id.* at 25:8:15 ("There was a threat to harm the estates, and that threat is a breach of the duty of loyalty. Under New York law, the duty of loyalty requires the director to subordinate their interests to the company. That did not happen here. There is also a harm to the bankruptcy process. It relies on the ability of fiduciaries to be trusted with estate assets and to refrain from insisting on fees as a precondition to maximizing value."); *id.* at 25:16-26:2 ("[T]he record will support the two forms of relief that Solus is . . . requesting. First, there is cause to remove the plan administrator and appoint a successor. There's a failure to comply with the terms of the plan administrator agreement. There's a breach of fiduciary duty to harm the estates, unless fees are agreed to. There's the ultimate disclosure of the success fee in a way that's inconsistent with transparency afforded in the bankruptcy process. And there's a need to install an independent fiduciary that's focused on monetizing assets and not on fees."); *see id.* at 161 (testimony regarding what took place at meetings between Quest and Solus); *see id.* at 166 (same); *see id.* at 246:19-247:17 (same); Hr'g Tr. 196:8-15 (Oct. 25, 2018) [Case No. 02-41729, ECF No. 14740] ("Q. It's not [sic] question, Mr. Blauner, but why do you think that Quest should no longer serve as plan administrator? A. I own close to 45 percent of the claims. When I say I, Solus. These guys can't be the stewards of that investment. I have a duty to my investors to make sure that my fiduciaries act with loyalty and with care. And I'm trying to fulfill that by having these folks replaced by a plan administrator with integrity.").

As for *Continental Casualty*, another case cited by the Defendant, the court actually held against the insurer, finding that the fee exclusion did not preclude the insurer's duty to defend against a lawsuit because the necessary causal relationship did not exist. *See* 2017 U.S. Dist. LEXIS 29550, at \*35-\*36. The court stated that "at least some of the factual allegations in the . . . complaint do not necessarily bear a causal relationship to fees." *Id*. at \*35. Importantly, the court noted that "the relief sought in the [action] is not only the return of fees, but also an injunction removing Defendants from the Plan and permanently enjoining Defendants from acting as a fiduciary or service provider . . . ." *Id*. at \*36. As the Solus Motions sought relief far beyond the issue of fees, the *Continental Casualty* case actually supports the Plaintiffs here. The same is true for the *First Community* case, where the court also ruled against the insurer. In that case, the court found that the factual allegations in the class action complaint against the insured did not necessarily bear a causal relationship to fees. *See* 593 Fed. App'x at 290. The court stated that the "charging of fees was not the practice that caused the harm, even if First Community's actions were motivated by a desire to obtain more fees . . . Instead, fees were an additional harm caused by the policies and practices of which the [class action] plaintiffs complain." *Id*. The court concluded that "at least some of the allegations in the underlying petitions are not excluded by the fee-dispute exclusion" and the insurance company had a duty to defend First Community under the applicable policy. *Id.*

---

To the extent that the hearings addressed fees, it was for those that were already paid. *See, e.g.,* Hr'g Tr. 180 (Oct. 15, 2018) (testimony regarding work performed and compensation paid); Hr'g Tr. 195:13-19 (Oct. 25, 2018) ("[W]hat I told him was if an accounting showed that they had an obligation to return funds to the estate because they had not complied with our contractual obligations that they would never work again; i.e., if the accounting showed that they had stolen money from the estate, taken money from the estate, that they would never work again which is pretty obvious.").

## **CONCLUSION**

For the reasons stated above, the Plaintiffs' SJM is granted and U.S. Specialty's SJM is denied.  The Plaintiffs should settle an order on five days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon opposing counsel.

Dated: New York, New York
      March 17, 2022

                    */s/ **Sean H. Lane***
                    UNITED STATES BANKRUPTCY JUDGE